IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| REALTIME DATA, LLC, d/b/a IXO, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | Civil Action No. 6:10-cv-493 |
| v. | § | |
| | § | JUDGE CLARK |
| T-MOBILE USA, INC., | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM ORDER RE: DEFENDANT'S LICENSE DEFENSE**

Plaintiff Realtime Data LLC, d/b/a IXO proceeded to trial  against  Defendant T-Mobile

USA, Inc. claiming infringement of certain claims of United States Patent Nos. 7,161,506;

7,352,300; and 7,415,530. The jury failed to find that any asserted claim was infringed, and found

that all claims were obvious. The court subsequently reversed the jury's verdict of obviousness as

to certain asserted claims of the '300 patent and all asserted claims of the '530 patent. [Doc. # 662].

A judgment for Defendant will be entered on the remainder of the verdict.

T-Mobile also raised the defenses of express or implied license to infringement and release,

arguing that if it infringes, it is released from liability, or licensed to do so, under the terms of an

October 19, 2009 settlement license between Realtime and non-party F5 Networks, Inc. ("F5"). With

the agreement of the parties, this issue was tried to the court. Given the verdict, it may seem that the

matter is now moot. However, to allow all issues to be presented on appeal at the same time, the

court enters this memorandum order. In brief, the court concludes that T-Mobile has not carried its

burden to demonstrate it is an entity to which a release or  a license was granted  under the Realtime-

F5 Agreement.

## I. BACKGROUND

A.      **Time Line of Events**

October 26, 2006      T-Mobile enters into agreement with Flash Networks, Ltd. ("Flash") for systems that include F5 products.

April 3, 2009         F5 enters into a "Technology Alliance Agreement" with Flash.

October 19, 2009      Realtime settles a lawsuit with F5, granting a release for prior acts and a license, with no right to sublicense. T-Mobile now relies on this agreement for its license defense.

B.      **The Flash-T-Mobile Master Agreements**

Flash and T-Mobile entered into a Master Agreement on October 26, 2006 whereby Flash would sell certain hardware, and license certain proprietary software, to T-Mobile. PX 33 at FNI01243.[1] The software consisted of Flash's NettGain system. *Id.* at Attachment A-1. The Master Agreement was amended in May 2008. PX 32. The Software covered by the amendment consisted of Flash's Harmony system. *Id.* at Attachment 1, Ex. F, at FNLTD-02218.  As discussed below, the F5-Flash Agreement provides that both Flash's NettGain and Harmony systems contained F5's Viprion and/or BigIP[2] product. There was also trial testimony that F5 sells Viprion with the BigIP software as part of the Flash Harmony product. Tr. at 1052:18-25.[3]

---

[1]When the court refers to "PX" or "DX" in this Order, in connotes Plaintiff's exhibits (PX) and Defendant's exhibits (DX) used during the February 2013 trial.

[2]These products were capitalized and punctuated several different ways in various documents. The court will use "Viprion" and "BigIP" consistently in this Order for ease of understanding.

[3]Unless otherwise noted, all transcript citations in this Order are from the February 2013 trial transcript and are cited as "Tr. at [page:line]."

The jury was asked to determine whether T-Mobile's use of the T-Mobile system containing the Flash Harmony product, or the T-Mobile system containing the Flash Harmony product, infringed any of the patents-in-suit.

### C.   The F5-Flash Technology Alliance Agreement

On April 3, 2009—several months prior to the Realtime-F5 Agreement at issue in this case—F5 entered into a Technology Alliance Agreement with Flash Networks, Ltd. This Agreement referred to Flash as "Partner." Doc. # 490-13 at Preamble.[4] The Agreement explained that F5 and "Partner":

> desire to form an alliance in order to achieve product interoperability between F5's application traffic management and/or secure remote access products and Partner's products. Once successful product interoperability is achieved, Partner and F5 intend to engage in mutually agreed-upon sales and marketing activities for the purpose of identifying customer opportunities for both parties.

*Id.* at ¶ 1. The Agreement lists in Exhibit B several products that were interoperable  prior to the Agreement: F5's Viprion and BigIP products, and Flash's NettGain and Harmony products. *Id.* at Ex. B.

### D.   The Realtime-F5 Settlement and License Agreement

On October 19, 2009, Realtime and F5 entered into a Settlement and License Agreement. DX 37. This Agreement included a license and a release.

---

[4]The F5-Flash Agreement was not introduced as an exhibit at the February 2013 trial, but the court will consider it in this Order because it was attached as an exhibit to T-Mobile's response to Realtime's motion for summary judgment on the license defense. Doc. # 490-13.

1.      **The Agreement's license provisions**

With respect to the license, the Agreement stated that:

Realtime Data Patents hereby grants to F5 and its Subsidiaries . . . a perpetual, non-exclusive, fully paid-up, irrevocable . . . license under the Realtime Data Patents to make, have made, import, use, offer to sell and sell, any product (including hardware, software, or any combination thereof) or process or services covered by the claims of the Realtime Data Patents within the scope of F5's Field of Use. The foregoing grant notwithstanding, no rights are granted herein to F5 (i) under Excluded Financial Data Feed Patent Rights or (ii) outside of F5's Field of Use.

DX 37 at ¶ 2.1. The Agreement then states that nothing within it "shall be construed as granting F5

or its Subsidiaries the right to grant sublicenses to third parties. *Id*. at ¶ 2.2.  Definitions include:

- The **"Realtime Data Patents"** are defined as, relevant to this case, "all patents and patent applications currently owned by Realtime Data, identified in Exhibit A" to the Agreement. Exhibit A  includes all three of the patents-in-suit. *Id.* at ¶ 1.1.

- F5's **"Field of Use"** is defined as including: "network access management"; "network and data center orchestration and workflow management"; and  "the compressing, decompressing, acceleration, routing, encrypting or decrypting of any data, including, but not limited to, data that is in a format specific to protocols for financial market data." *Id.*

2.      **The Agreement's release provisions**

Realtime released:

(i) F5 . . . and their Subsidiaries, affiliates, successors and assigns, and (ii) solely with respect to F5 products, processes and/or services which are a material part of the claimed system or method of the Realtime Data Patent(s), their customers, distributors, partners, and resellers, of and from every claim and cause of action of any kind whatsoever, whether or not now known, that Realtime Data ever had, now has or hereafter can, shall or may have, based upon any events or actions occurring prior to the Effective Date of this Agreement within F5's Field of Use and relating to licensed Realtime Patents.

*Id.* at ¶ 4.1. In other words, two different groups are released:

- F5 and its subsidiaries, affiliates, successors and assigns for all F5 products, processes, and/or services; and

4

- F5 customers, distributors, partners, and resellers solely with respect to F5 products, processes, and/or services which are a material part of the claimed system or method of the Realtime Data Patents.

Both groups are released only for claims based on events or actions: (a) occurring prior to October 19, 2009 that are (b) within F5's Field of Use and (c) related to licensed Realtime Patents.

### 3.    The Agreement's choice of law provision

The final clause of the Agreement relevant to this Order is that it shall be governed by, and construed in accordance with, New York law. *Id.* at ¶ 9.5.

## II.  T-MOBILE DOES NOT HAVE A LICENSE UNDER THE REALTIME-F5 SETTLEMENT AND LICENSE AGREEMENT

T-Mobile argues that it is licensed to sell the allegedly infringing products, based on the language of the Realtime-F5 Settlement and License Agreement. The Realtime-F5 Agreement states that it is to be interpreted under New York law, and no party has suggested some other law should be used to interpret the Agreement. The court first examines general principles of New York contract law.

### A.    New York Law On Contract Interpretation

Contract interpretation is a question of law. *See, e.g., Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 363 (N.Y. 2009). "A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." *See Brad H. v. City of New York*, 951 N.E.2d 743, 746 (N.Y. 2011). Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous. *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.E.2d 639, 642 (N.Y. 1990).

Even if a clause is ambiguous, "under the principle of *contra proferentum,* courts are to construe ambiguous contract terms against the drafter." *Newman & Schwartz v. Asplundh Tree Expert Co.*, Inc., 102 F.3d 660, 663 (2d Cir. 1996) (interpreting New York law). No party argued in this case that the contract was ambiguous, and the court concludes that it is not. Therefore, the court will interpret the contract as a matter of law.

**B.      No Express License Granted to T-Mobile**

The Realtime-F5 Agreement, Section II, stated that Realtime granted a license to F5 and its subsidiaries. A subsidiary is defined in the Agreement as "any corporation, company or other business entity in which at least fifty-one percent (51%) of whose outstanding shares or stock . . . are on the Effective Date of this Agreement or thereafter, owned or controlled, directly or indirectly, by F5 . . . ." DX 37 at ¶ 1.1. As no party has provided evidence, or even intimated, that T-Mobile is a subsidiary of F5, there is no express license based on the license provision of the Realtime-F5 Agreement.

Likewise, T-Mobile cannot argue that it somehow benefits because Flash is a subsidiary of F5 and therefore has a license to the patents. There is no evidence that F5 owns or controls any stock of Flash. Realtime simply has not expressly licensed its intellectual property to T-Mobile or to Flash.

**C.      T-Mobile Is Not Entitled To An Implied License**

To prove an implied license defense, T-Mobile must demonstrate by a preponderance of the evidence both: (1) that the patentee sells an article that has no non-infringing uses; and (2) that the circumstances of the sale plainly indicate that a grant of license should be inferred. *Anton/Bauer, Inc v. PAG Ltd.*, 329 F.3d 1343, 1350 (Fed. Cir. 2003). With respect to the second element, the court should consider whether: (1) a relationship existed between the parties; (2) within that relationship,

the patentee granted a right to use the patented invention; (3) the patentee received valuable consideration for that grant of right; (4) the patentee denied that an implied license existed; and (5) the patentee's statement and conduct created the impression that it consented to the alleged infringer's making, using, or selling the patented invention. *Wang Labs., Inc. v. Mitsubishi Elec. Am., Inc.*, 103 F.3d 1571, 1579 (Fed. Cir. 1997).

There is no evidence in the record that the first prong of the test (no non-infringing uses) is satisfied. Even if it was, the court still cannot infer that the circumstances of the sale plainly indicate that an implied license should be granted. The Realtime-F5 Agreement clearly excludes sub-licensing.  Under the Flash-T-Mobile Master Agreement, that is precisely what Flash is doing with the F5 software—licensing it to T-Mobile. Given the language of the Realtime-F5 Agreement and the facts of this case, the court cannot find by a preponderance of the evidence that an implied license existed. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 71 (Fed. Cir. 2012) (citing *E.I. duPont de Nemours & Co., Inc. v. Shell Oil Co*, 498 A.2d 1108 (Del. 1985)).

### III. THE REALTIME-F5 AGREEMENT'S RELEASE PROVISIONS DO NOT PROTECT T-MOBILE

**A.     Release Provision of Realtime-F5 Settlement and License Agreement**

As mentioned above, Section 4.1 of the Realtime-F5 Agreement releases:

1.     F5 and its subsidiaries, affiliates, successors and assigns for all F5 products, processes, and/or services; and

2.     F5 customers, distributors, partners, and resellers solely with respect to F5 products, processes, and/or services which are a material part of the claimed system or method of the Realtime Data Patents.

Both groups are released only for claims based on events or actions that occurred prior to October 19, 2009 that are within F5's Field of Use and related to the licensed Realtime Patents.

There does not seem to be any dispute that if T-Mobile falls into either of the above released groups, any events involving, or actions of, T-Mobile that occurred prior to October 19, 2009 would be released because T-Mobile's accused products are within the Field of Use (i.e., the compressing, decompressing, and acceleration of data) and are accused of infringing three of the licensed Realtime Patents.

**B.      T-Mobile Is Not A Subsidiary, Affiliate, Successor, Or Assign of F5 Under The First Release Clause**

T-Mobile did not assert at trial, or in its briefing,  that it fell within the first group of those released, and the court considers this argument to be waived.  But, it must be recognized that the circuit court may apply the waiver rule less strictly when a failure to assert or brief occurs at the trial court. *Compare Smithkline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (issues raised on appeal,  but not fully argued,  not considered), *with Israel Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1265-66 (Fed. Cir. 2007)( circuit court considered  arguments about contractual provision  raised for the first time on appeal,  where another argument was made to district court).  Accordingly,  the court will analyze this issue.

As set out above, the court has determined there is no basis to find that T-Mobile is a subsidiary of F5. Nothing in the agreements under review indicates that T-Mobile is a successor to F5, or that F5 assigned any rights to T-Mobile. "Affiliate" may be a  broader term..

The question is whether, under New York law, F5 and Flash might have some kind of "affiliate" relationship under their Technology Alliance Agreement, and if so whether that might inure to the benefit of T-Mobile. The Second Circuit, applying New York law and utilizing the definition of this term found in Black's Law Dictionary, has defined an "affiliate" as "being close

in connection, allied, associated, or attached as a member or branch." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir. 2001). Although not directly on point, statutes and regulations in the securities context that discuss affiliation indicate some degree of control is necessary to be an affiliate. *See, e.g.*, 15 U.S.C. § 80a-2(a)(2), (3) (Investment Company Act); 17 C.F.R. §§ 230.144(a), 230.405 (Rules and Regulations for the Securities Act of 1933).

Nothing in the Realtime-F5 Settlement and License Agreement, or in the F5-Flash Technology Alliance Agreement, hints at an "affiliate" relationship between F5 and T-Mobile. The F5-Flash Technology Alliance Agreement describes Flash as "partner," but the relationship is more like a joint venture than a partnership. Under New York law, a partnership is defined as "an association of two or more persons to carry on as co-owners of a business for profit." *In re Nassau Cnty. Grand Jury Subpoena Duces Tecum Dated June 24, 2003*, 830 N.E.2d 1118, 1125 (N.Y. 2005). A joint venture is defined as "a special combination of two or more persons where in some specific venture a profit is jointly sought without any actual partnership or corporate designation." *Chalmers v. Eaton Corp.*, 419 N.Y.S.2d 217, 219 (N.Y.App Div. 1979) (internal quotation omitted).

F5 and Flash undertook a specific project—to "achieve product interoperability between F5's application traffic management and/or secure remote access products and" Flash's products, followed by engagement in "mutually agreed-upon sales and marketing activities"—but did not form a partnership. Each party has some review of the other's actions, but there is insufficient evidence in the record of the degree of control or close relationship required for affiliation under New York law. Even if Flash could be considered an affiliate of F5, nothing in New York law indicates that T-Mobile could acquire that status on the basis of its purchases from Flash.

**C.      T-Mobile Has Not Shown That The Second Release Clause Applies**

Section 4.1(ii) of the Realtime-F5 Agreement provides that:

Realtime Data, and its affiliates, successors and assigns hereby release and forever discharge . . . (ii) solely with respect to F5 products, processes, and/or services which are a material part of the claimed system or method of the Realtime Data Patent(s), their customers, distributors, partners and resellers, of and from every claim . . .

**1.      T-Mobile is a downstream customer of F5**

T-Mobile does not assert that it was an F5 distributor, partner, or reseller and nothing in the record would support such a conclusion. To the extent that T-Mobile would assert that it was a customer under the Realtime-F5 Agreement because it was a customer of F5 partner Flash, the court has already rejected the idea that F5 and Flash were partners. If Flash and F5 are not partners, T-Mobile acknowledges that its only argument is that it was a downstream customer of F5. *See, e.g.*, Doc. # 647 at 6 ("T-Mobile is unquestionably a downstream 'customer' of F5."); Doc. # 466 at 19 ("T-Mobile is released under the F5 Settlement Agreement for two separate reasons. First, T-Mobile is a direct 'customer' of F5's partner Flash. Second, T-Mobile is a downstream 'customer' of F5.").

Realtime disputes that T-Mobile is a downstream customer of F5, noting that the Realtime-F5 Agreement simply says "customer," not "downstream customer" and there is no evidence that the term "customer" was intended to include entities that purchased F5 components from a source other than F5.

It is uncontested that T-Mobile purchased F5 products (Viprion and BigIP) from Flash, which obtained the F5 products from F5. The Realtime-F5 Agreement releases F5's "customers" without any caveats or limitations as to the type of "customer." As there are no limitations placed on the word "customer" in the Realtime-F5 Agreement, the court declines to find that the Agreement

somehow limited "customer" only to direct customers. And even if the court were to conclude that the Agreement is ambiguous on this point, ambiguities are construed against the drafter. *Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 663 (2d Cir. 1996) (interpreting New York law). Unlike Realtime, T-Mobile was not a party to the Realtime-F5 Agreement, and had no hand in drafting it.

The court concludes that because the Realtime-F5 Agreement does not limit the term "customer", the term should be construed to include downstream customers like T-Mobile.

> **2.      The F5components—Viprion and BigIP—were not shown to be a material part of the claimed system or method of patents-in-suit**

The parties dispute whether the F5 component has to be a material part of the patents-in-suit or a material part of T-Mobile's accused system. *Compare* Doc. # 466 at Page ID# 18275 (T-Mobile's motion for summary judgment: "This unambiguous language clearly requires an F5 product to be a material part of 'Realtime Data's patents,' as opposed to a material part of 'T-Mobile's accused system'") *with* Doc. # 486 at Page ID# 20500 (Realtime's response to T-Mobile's motion for summary judgment: "The Court should reject T-Mobile's strained interpretation of the F5 release and apply its language as written—limiting it first to F5 products and then to F5 customers to the extent that F5 products were a "material part" of a system or method that infringed Realtime's patents.").

Realtime's position would re-write the Realtime-F5 Agreement. The Agreement states that the release applies to "F5 products, processes, and/or services which are a material part of the claimed system or method of the Realtime Data Patent(s)." The Agreement does not state "F5 products, processes, and/or services which are a material part of the system or method that infringes,

or is accused of infringing, Realtime Data Patent(s)." Realtime's position has no basis in the agreement. The proper question is whether the F5 products—Viprion and/or BigIP—are a material part of the claimed system or method of the patents-in-suit.

At trial, T-Mobile's witness Flash Networks Chief Technology Officer and general manager Ofer Gottfried testified that the purpose of the F5 components in the Flash Harmony solution was to: (1) receive data and direct the appropriate traffic to the Harmony box; (2) load balance the traffic between the Harmony blades; and (3) control the security and the redundancy. The F5 "box" is essentially a computer sold as part of the Flash Harmony system, and contains F5's Viprion with BigIP software. Tr. at 1050:21-1051:20; 1052:18-22.

On cross-examination, and on direct with its own infringement expert Dr. Schonfeld, Realtime's position was essentially that the F5 components in the T-Mobile system containing the Flash Harmony product do not perform data compression, which is what the patents-in-suit are directed toward. Tr. at 1061:23-1064:22 (cross-examination of Mr. Gottfried); 1066:16-1067:10 (direct of Dr. Schonfeld). Dr. Schonfeld's testimony was that analysis of the F5 components in the T-Mobile system containing the Flash Harmony product is not necessary to prove infringement of any of the asserted claims, and that the F5 component in T-Mobile's accused system does not have anything to do with data compression.

Dr. Schonfeld's direct testimony on this point consisted of an unsupported opinion that the F5 component of the T-Mobile system containing the Flash Harmony product is not a material part of the patents-in-suit. The court puts little stock in Dr. Schonfeld's *ipse dixit* conclusion. *See, e.g., Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).

However, despite a strong effort by T-Mobile on cross-examination to discredit Dr. Schonfeld's unsupported opinion, the burden to demonstrate that a license exists ultimately rests on T-Mobile, not Realtime. The court does not find Mr. Gottfried's testimony sufficient to demonstrate that the F5 component actually was a material part of the inventions in the patents-in-suit. Mr. Gottfried testified on cross-examination that the F5 component does not perform data compression, Tr. at 1061:12-14. In large part, the patents-in-suit are directed toward data compression. The court also notes that Mr. Gottfried testified as a lay witness, because T-Mobile could not be bothered to designate an expert in support of a defense on which it had the burden of proof. T-Mobile simply has not carried its burden to demonstrate that the release provision of the Realtime-F5 agreement applies.

In a sense, the release provisions are irrelevant to T-Mobile under any plausible set of facts. If the T-Mobile system does not infringe at all, as T-Mobile contended and the jury found, the release provisions of the Realtime-F5 agreement are moot. If, on the other hand, T-Mobile's system does infringe, one of three possibilities is presented: (1) T-Mobile's system infringes and the F5 component does not; (2) both T-Mobile's system and the F5 component separately infringe[5]; or (3) T-Mobile's system infringes only because of the F5 component. In the first two scenarios, the release provisions would not help T-Mobile. Only if T-Mobile's system infringes solely because of the F5 component would the release provision apply to excuse the infringement. There was no testimony or other evidence to indicate that the F5 component alone is what made the T-Mobile system

---

[5]With respect to (2), the court has not found, and the parties have not cited, any case law that would allow a T-Mobile system that infringes the patents-in-suit without the F5 component to be immunized simply by the addition of a licensed component that would also infringe the patents-in-suit.

infringing. After careful review of the testimony given at trial, the court concludes that T-Mobile has

not carried its burden to prove that the release provision of the Realtime-F5 agreement applies.

### IV. T-MOBILE IS NOT ENTITLED TO THE BENEFIT OF THE PATENT EXHAUSTION DOCTRINE

Even though it raised the issue briefly on summary judgment, T-Mobile did not include an

exhaustion defense in the Final Pre-Trial Order. Doc. # 514. A Final Pre-Trial Order supersedes all

prior pleadings. *Meaux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 167 (5th Cir. 2010). As

patent exhaustion is a doctrine separate and distinct from a license defense, *Quanta Computer, Inc.

v. LG Elecs., Inc.*, 553 U.S. 617, 637, 128 S. Ct. 2109, 2122 (2008), simply raising a license defense

is insufficient to present the issue for court determination.

Even considering the issue for the sake of complete analysis, patent exhaustion is triggered

where the "only reasonable and intended use [of the F5 component] was to practice the patent" and

where the F5 product component "essential features" of the patented invention. *Id.* at 631, 128 S. Ct.

at 2119. In other words, exhaustion occurs if the F5 component constitutes:

> a material part of the patented invention and all but completely practice the patent. Here, . . . the incomplete article substantially embodies the patent because the only step necessary to practice the patent is the application of common processes or the addition of standard parts. Everything inventive about each patent is embodied in the [F5 products].

*Id.* at 633, 128 S. Ct. at 2120. As the court concluded above that T-Mobile has not carried its burden

to prove that the F5 component was a material part of the patents-in-suit, T-Mobile has likewise

failed to carry its burden to demonstrate that exhaustion has been triggered.

### V. CONCLUSION

Before the issues of license or release merit serious consideration on appeal, Realtime must

first demonstrate harmful error by the court that justifies overturning the jury's verdict on

infringement. Then, as to those claims for which the court did not grant judgment as a matter of law, Realtime must demonstrate harmful error by the court, or a lack of evidence in the record, that justifies overturning the jury's verdict on invalidity.  All of this seems unlikely to occur, given the deference due a jury verdict.

However, so that all issues may be presented together on appeal, the court has considered the evidence and law on these defensive issues and, for the reasons stated,  concludes that: (1) T-Mobile has not carried its burden to demonstrate by a preponderance of the evidence that it was entitled to an express or an implied license to use the technology of the patents in suit; and (2) the release provision of the  Realtime-F5 Settlement Agreement do not apply to T-Mobile.

Nevertheless, in light of the jury's verdict and the court's Order that only granted in part Realtime's motion for judgment as a matter of law as to invalidity [Doc. #662], judgment for T-Mobile will be entered by separate Order.

So **ORDERED** and **SIGNED** this **28** day of **March, 2013.**


_____
Ron Clark, United States District Judge